UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| J.B.F., by and through his guardian Marilyn Stivers, | ) ) ) | |
| Plaintiff, | ) ) | No. 5:15-CV-33-REW |
| v. | ) ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| KENTUCKY DEPARTMENT OF EDUCATION, et al., | ) ) ) | |
| Defendants. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

Defendants—the Kentucky Department of Education (KDE), Kentucky School for the Deaf (KSD),[1] and Scott Haun[2] in his individual and official capacities—moved for summary judgment. DE #20 (Motion). Plaintiff, J.B.F.,[3] by and through his guardian Marilyn Stivers, responded. DE #25 (Response). Defendants replied. DE #27 (Reply). The motion is ripe for consideration. For the following reasons, the Court fully **GRANTS** DE #20. Various immunity doctrines shield each Defendant from every claim. Alternatively, the state-law claims against Haun individually fail on the merits.

---

[1] KSD is a public school in Danville, Kentucky, that serves kindergarten through 12th grade deaf and hard-of-hearing students. *See* KRS 167.015; *see also* About Us—Academics, Kentucky School for the Deaf, http://www.ksd.k12.ky.us/Content/12 (last visited June 2, 2016).

[2] Plaintiff named "Scott Houn" in the Complaint, but the record shows that the proper surname spelling is Haun. *See, e.g.*, DE #25-2 (Haun letter to Stivers). The Court will refer to this defendant as Haun. Haun was a KSD School Safety Officer at the times relevant to the Complaint. *See, e.g.*, *id.* The Court previously dismissed former Defendant Will Begley. DE #5 (Order).

[3] Due to the nature of the case, the Court adopts the parties' practice of referring to Plaintiff and other students at the times relevant to the Complaint by initials.

1

## I.      BACKGROUND

On February 4, 2014, two KSD students and dormitory roommates, J.B.F. (then age 20) and J.B., engaged in sexual acts in their shared dorm bathroom. There is evidence in the record to support either that the acts were consensual or nonconsensual. *Compare* DE ##18-4 & 18-5 (Michael Jamison, dorm team leader, contemporaneously characterizing the occurrences as "Consensual sexual activities"), DE #18-6 (Haun letter to Stivers expressing same), *and* DE #18-8 (contemporaneous notes stating, "forced? willing? said willing. embarrassed"), *with, e.g.*, DE #18-1 (J.B.F. Depo.), at 32 ("At any time did you consent or tell J.B. that was okay? No.").

Beside the limited documentation from the school, the proof mostly consists of J.B.F.'s and Stivers's depositions. J.B.F. described the events leading up to the incident. While a student at KSD, J.B.F. "wanted to be roommates with J.B." DE #18-1 (J.B.F. Depo.), at 12. J.B.F. generally stated that two other students (not J.B.) had been mean to him previously (which he had told to someone at KSD). *Id.* at 15-16. J.B.F. agreed that before the incident, he had never told anyone at KSD that he was afraid of J.B. *Id.* at 45. Stivers confirmed. DE #18-2, at 24. Following a free-flowing deposition exchange, the following picture emerged of J.B.F.'s version of events:

On February 4, 2014, by around 4:15 p.m., J.B.F. had returned to his dorm after finishing in workshop and concluded showering. He re-dressed in the bathroom and slightly cracked the bathroom door to let steam out. J.B.—his roommate—then came into the bathroom and looked up pornography on his phone. Both students left the bathroom. Apparently, at that time, J.B.F. left the dorm room, walked down the hallway, and alerted

Jamison[4] and Mike Yance[5] that J.B. had accessed pornography—which was all J.B.F. told Jamison and Yance. At some point, J.B. also left the dorm and went to Jamison's office. Again, at some time (J.B.F.'s timeline is by no means clear), both students returned to the dorm (although not together). *See generally* DE #18-1 (J.B.F. Depo.).

While J.B.F.'s deposition reflects considerable confusion concerning the precise sequence, J.B.F. indicated that J.B. asked him to have sex while they were in the living room after returning from Jamison's office. J.B.F. declined. At some point, J.B.F. and J.B. moved into the bedroom. There, J.B. said he wanted to punch J.B.F. J.B. then went into the bathroom while J.B.F. stayed in the bedroom. J.B. later returned to the bedroom and again said that he wanted to have sex. J.B. then physically grabbed J.B.F.'s arm and pulled him into the bathroom. J.B.F. said both that he tried to escape (physically tried to get out) (DE #18-1, at 17, 27) and that he did not try to fight J.B. off (*id.* at 26). J.B. directed J.B.F. to perform oral sex and engage in anal sex; J.B.F. declined. J.B. then said he wanted to kill J.B.F. and used a key as a weapon. J.B. punched J.B.F. with the key in the chest three times. J.B. had locked the bathroom door, and J.B.F. unsuccessfully tried to open it. By that point, J.B. was naked, but J.B.F. initially remained clothed, although he said that J.B. "pulled [his] underwear down." *Id.* at 28. Ultimately, J.B.F. performed oral sex on J.B., and the two engaged in anal sex. J.B.F. testified that, contrary to the school's reports, he did not consent to the acts.[6]

---

[4] Michael Jamison is the applicable KSD dorm team leader (J.B.F. described him as "the boss"). Defendants described him as the dorm "supervisor." DE #20-1, at 2.

[5] J.B.F. described Yance as "the really strict one." DE #18-1, at 40. Stivers described him as "the dorm father." DE #18-2, at 57.

[6]     J.B.F.'s deposition contained multiple inconsistencies and / or contradictory answers. For instance, he first testified that he did not take his clothes off. DE #18-1, at 27. The following exchange occurred: "Did you have all of your clothes on? Yes. Did

At around 4:30 p.m. (a total elapsed time of fifteen minutes since J.B.F.'s return to the dorm from workshop),[7] Yance appeared at the room to locate J.B.F. and "flickered the light switch on and off and banged on the door[.]" *Id.* at 26. When this happened, J.B. opened the bathroom door, and Yance "found out" what had happened between the students. *Id.* at 38. Yance retrieved Jamison, and the two returned to the students' dorm. Jamison spoke with J.B.F.[8] J.B.F. testified that he did not tell Jamison that he consented to sex with J.B. *Id.* at 39.

Jamison, however, summarized the incident as follows:

I was doing a quick room check of students this afternoon and went to [J.B.F.'s] room to see if he had begun to clean his room as he was

_____

J.B. ever try to take any of your clothes off? No. Did you ever take any of your clothes off? J.B. pulled my pants down." *Id.* at 28.

As a second example, this exchange occurred: "Did you touch any of J.B.'s private genital area while you all were in the shower room? No. You mentioned earlier that J.B. wanted you to perform oral sex for him? Yes. Did that actually ever happen in the shower room? Yes. It did? Yes. Okay. So did you perform oral sex on J.B., or did he perform oral sex on you? He did it on me. Okay. So J.B. put his mouth on your private genital area? No. Did you put your mouth on his private genital area? Yes." *Id.* at 28-29.

A third example: "Did you talk about this incident or encounter between you and J.B. with anybody other than Michael [Jamison]? No. You didn't discuss it with anybody else at the school? No. Did you ever talk to Yance about it. Yes." *Id.* at 39-40. Further, J.B.F. later stated that he also told Stivers. *Id.* at 41-42 ("Before the letter was sent to your aunt, did you tell her what happened? Yes. You did? Yes."). J.B.F. said this happened on the Friday immediately following the incident (*i.e.*, February 7, 2014). *Id.* at 42.

Additionally, as expressed above, the bathroom—living room—bedroom—bathroom progression, in connection with J.B.F. and J.B. both leaving the dorm to visit Jamison and Yance, is far from clear. J.B.F. made no mention of the living room encounter after the deposition questioning brought out the Jamison interactions. J.B.F. did not initially mention the Jamison / Yance encounter—quite an important detail—when telling his story; it only came out toward the end of questioning. A general picture of J.B.F.'s remembrance emerges from the deposition, but significant murkiness remains.

[7] The handwritten notes indicate that "M. Jamison open the door" with a time marker of "2/4/14 5:15." DE #18-8, at 1. The KSD incident report forms indicate a time of 4:20 p.m. DE ##18-4, 18-5.

[8] Defendants indicate that immediately post-incident, "Mr. Yance supervised J.B.F." and later "Mr. Haun and Mr. Jamison interviewed J.B.F." DE #20-1, at 3.

> restricted to his room this afternoon until it was cleaned. I entered the
> room and [J.B.F.] and his roommate [J.B.] were no where to be found in
> the room. I noticed the shower door closed. I went to check to see if [J.B.]
> was any where else in the dorm and he was not. I went back to the room
> and flipped the light switch to get whoever was in the shower room's
> attention. After approximately 4 minutes, [J.B.] opened the door while
> trying to button his pants. [J.B.F.] was hiding behind the door trying to
> latch his pants up. He didn't have his shoes on as they were on the floor
> and it was obvious what was going on in the shower room. Both boys
> were sent to my office for discussions. [J.B.F.] was not cooperative at first
> but later confessed to allowing anal penetration and performing manual
> stimulation as well as oral sexual activities on [J.B.]. [J.B.] also confessed
> to [J.B.F.] performing manual stimulations on him as well as [J.B.F.]
> performing oral sex on him as well. [J.B.] denied any penetration
> occurred.

DE #18-4. The contemporaneous handwritten notes indicate that J.B.F. changed the story

of what happened multiple times—"at 1st denied [line break] admitted 'yes' . . . [line

break] anal sex yes [line break] no anal sex [line break] [J.B.F.] later said no anal then

yes." DE #18-8, at 1.[9]

There is evidence that KSD officials attempted to contact Stivers very soon after

the incident. *See, e.g.*, DE ##18-4 (Incident Report Form on J.B.F. with "Parent

contacted" box checked on 2/4/14 and handwritten note stating, "left message to call back

. . . Jamison called left message several times to call back"); 18-8 (Notes), at 2 ("M.J.

[presumably, Jamison] tried to contact aunt as he reported. left message") and 3 ("M.J.

called aunt left message."). An email indicates that Jamison made a "third attempt" to call

Stivers at 8:27 p.m. on February 6, 2014. DE #20-2. Jamison indicated that he got her

machine for the third time that day and "left another message[.]" *Id.* Further, J.B.F.

testified that he told Stivers of the incident the Friday after it happened. DE #18-1, at 42.

---

[9] While Jamison wrote violations for consensual sexual contact, J.B.F. stated in his
deposition that he never told Jamison that he "agreed to or consented to have sex with
J.B." DE #18-1, at 39.

Haun indisputably sent the letter informing Stivers of the disciplinary action on March 4, 2014—a month following the incident. DE #18-6 (Letter).

Marilyn Stivers is the legal guardian of J.B.F. DE #1-1 (Complaint), at ¶ 2. Stivers, in her deposition, had no "reason to believe that there were any altercations, harassment, abuse between [J.B.F.] and J.B. prior to the February 2014 incident[.]" DE #18-2, at 25. Stivers described receipt of the KSD letter as her first notice of the incident. She expressly stated that J.B.F.'s testimony that he notified her of the incident the Friday after it occurred was false. *Id.* at 28-29. After receiving the letter, she confronted J.B.F., who described the incident to her and said that KSD staff ("they") said that J.B.F. was "guilty." *Id.* at 27. She said [and mostly this is hearsay] that both students were "taken to the office in the same office at the same time sitting in the same room to be questioned." *Id.* at 28. She denied knowledge of KSD's attempts to call her: "There was nothing on my home phone, and I've always told them to call my cellphone. The home phone is just for Internet only. There was no messages [sic] on my phone." *Id.* at 33-34.[10] Stivers and her husband went to KSD the Monday after letter receipt. She questioned KSD officials about "what took them so long to tell me why they questioned my son without my presence," why the officials put both students in the same room for questioning, and why they told J.B.F. he was "guilty." *Id.* at 35. She further inquired into the guidelines for police or other state services contact. *Id.* at 36. She described a later police investigation she initiated. *Id.* at 39-40.[11]

---

[10] *See also* DE #18-2, at 42 ("[T]here w[ere] no messages on the home phone, no missed calls. I didn't get the phone bill. There w[ere] no calls from KSD to myself, and that's the only number – I said in an emergency, you can call the home phone, but this is the number that is the main prior contact, cellphone only." (paragraph break omitted)).

[11] The record does not document that investigation, but it is clear no charges resulted.

Stivers testified that she *did* think that KSD intended to harm J.B.F. *Id.* at 55 ("Because the incident happened in March and I was not notified until February,[12] and I kept sending my son back not knowing what was going on, oblivious to what had happened to him. . . . I believe they did not give him protection. They did not take every measure to protect him or anybody else at that school."). However, Stivers was not aware of other incidents of harassment or abuse of J.B.F. at KSD following the J.B. incident. *Id.* at 57-58. She agreed that KSD's handbook did not require a police investigation. *Id.* at 60. She did not have information "that indicates the policies or procedures were applied differently to [J.B.F.] than they were applied to other students in the school[.]" *Id.* at 61. She agreed that J.B.F. and J.B. were separated as roommates. *Id.* at 62. Stivers did not have any information regarding KSD staff training or instruction. *Id.* She indicated that J.B.F. may not understand what the word "consensual" means. *Id.* at 64-65.

The underlying J.B.F.—J.B. incident, along with Defendants' actions preceding and following it, gave rise to this case. J.B.F., by and through Stivers, his guardian, sued, alleging four claims: (1) § 1983 / Equal Protection Clause violations; (2) negligence; (3) negligent supervision / hiring; and (4) intentional infliction of emotional distress (IIED). *See* DE #1 (Complaint). Following a period of discovery, Defendants moved for summary judgment on all claims, and the matter is fully briefed. DE ##20 (Motion), 25 (Response), 27 (Reply).

## II.    STANDARD OF REVIEW

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

---

[12] It appears that Stivers mistakenly reversed the months. The other evidence indicates that the incident happened in February.

of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim.

8

Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444-45 (6th Cir. 2006).

## III.    ANALYSIS

Defendants advance a variety of arguments to avoid liability, mostly centered on various immunity defenses.[13] The Court will analyze each in turn.

---

[13] The Court must remark on the particular unhelpfulness of the briefing in understanding and framing the issues. Defendants' brief is perplexingly organized and quickly passes over major areas of immunity analysis. The bigger problem, however, is Plaintiff's brief. Plaintiff does not meaningfully grapple with a variety of key immunity questions presented and spills much ink—entire briefing sections—over wholly tangential matters. Further, Plaintiff cites documents that he does not attach—*e.g.*, the KSD Code of Conduct. *See* DE #25, at 11 (referencing the Code as Exhibit 3, but not attaching it). Plaintiff also summarizes or alleges factual history with utterly no citations to proof or the record. In the end, the briefs largely talk past one another, and neither side completely examines the alleged bases for judgment, leaving the Court to evaluate as best it can. This has complicated and lengthened the decisional process.

*Immunity on the Federal Claim – KDE, KSD, Haun (Official Capacity)*

First, Defendants argue that they are entitled to immunity from Plaintiff's § 1983 / Equal Protection claim. DE #20, at 4-5. Plaintiff opposes. DE #25, at 6-9.

"[A] state agency may not be sued in federal court, regardless of the relief sought, unless the state has waived its sovereign immunity or Congress has overridden it." *Whittington v. Milby*, 928 F.2d 188, 193 (6th Cir. 1991) (granting the Kentucky Cabinet for Human Resources immunity); *see also Ferritto v. Ohio Dep't of Highway Safety*, 928 F.2d 404, 1991 WL 37824, at *2 (6th Cir. Mar. 19, 1991) (*per curiam*) ("The Eleventh Amendment prohibits actions against states and state agencies under section 1983 and section 1985."). "The Eleventh Amendment bars a suit against a state or one of its agencies in federal court unless the state has given express consent, regardless of the relief sought. . . . Kentucky has not waived its immunity." *Adams v. Morris*, 90 F. App'x 856, 857 (6th Cir. 2004). "Eleventh amendment immunity extends to state agencies that act as arms of the state, but does not extend to cities, counties, or other political subdivisions of the state." *Creager v. Bd. of Educ. of Whitley Cnty., Ky.*, 914 F. Supp. 1457, 1460 (E.D. Ky. 1996).[14] The Sixth Circuit considers a variety of factors to determine if a governmental entity is an "arm of the state" for Eleventh Amendment purposes, including "local law and decisions defining the status and nature of the agency involved in its relation to the sovereign[, and] whether, in the event plaintiff prevails, the payment of the judgment will have to be made out of the state treasury," among others. *See Hall v. Med. College of Ohio*, 742 F.2d 299, 302 (6th Cir. 1984).

---

[14] Plaintiff's substantive reliance on *Creager* and *Blackburn v. Floyd Cnty. Bd. of Educ.*, 749 F. Supp. 159 (E.D. Ky. 1990), is misplaced. Those cases evaluated immunity of local Boards of Education. Plaintiff did not here sue a local Board of Education, as to which the immunity analysis differs.

Here, KDE is obviously a state agency and an arm of the state. It is one of Kentucky's principle governmental departments. The Kentucky Board of Education governs it. KRS 156.029(7); *see also* KRS 156.010; KRS 156.035. The General Assembly explicitly called the KDE a "state agency[.]" KRS 156.010(5). The law is clear that a "state agency may not be sued in federal court, regardless of the relief sought, unless the state has waived its sovereign immunity or Congress has overridden it." *Whittington*, 928 F.2d at 193. Plaintiff points to no waiver or congressional override of immunity. *See Adams*, 90 F. App'x at 857 ("Kentucky has not waived its immunity."). Indeed, the Kentucky General Assembly expressly disclaimed any immunity waiver as to the Kentucky Board of Education, the KDE, or their officers, agents, or employees. KRS 156.035(3)(c). KDE is thus entitled to immunity from the federal charge.

Second, KSD is "directly operated by the state" and is a subdivision of the KDE. *Eva N. v. Brock*, 741 F. Supp. 626, 630 (E.D. Ky. 1990); *see also* KRS 156.010(1)(d); KRS 156.070(1); KRS 167.015(1) ("[T]he Kentucky School for the Deaf at Danville, Kentucky, shall be managed and controlled by the Kentucky Board of Education."); KRS 167.150 (authorizing the Kentucky Board of Education to "prescribe admission policies, curriculum, and rules for the government and discipline of pupils" at KSD and "and fix and regulate tuition fees and terms of admission of [out-of-state] pupils"). As a mere subdivision of the state-agency Department, KSD is also immune from suit. Kentucky law indicates that KSD is dependent part of KDE, *Hall*, 742 F.2d at 302, and it appears that, as such, any judgment against KSD would be paid out of the Commonwealth's treasury, *id.* Under the same principles, KSD is likewise entitled to immunity from the federal charge.

11

Courts have regularly recognized that state boards of education, contrasted with local boards, equate to the state itself and thus receive immunity. *See, e.g.*, *Workman v. Mingo Cnty. Schools*, 667 F. Supp. 2d 679, 685 (S.D. W. Va. 2009) ("State boards of education[] are widely recognized as entitled to Eleventh Amendment protection.") (citing *Cullens v. Bemis*, 979 F.2d 850, 1992 WL 337688, at *1 (6th Cir. Nov. 18, 1992) (table) (stating that the Michigan Department of Education is "absolutely immune under the Eleventh Amendment"); *COPE v. Kansas State Bd. of Educ.*, 71 F. Supp. 3d 1233, 1241 (D. Kan. 2014) (dismissing Kansas State Department of Education and State Board of Education per Eleventh Amendment). Here, Kentucky's education department and KSD, a school it runs via the state board, are defendants and clearly fall within the shroud of immunity.

The Eleventh Amendment similarly bars damages claims against state officials sued in an official capacity. *See Kentucky v. Graham*, 105 S. Ct. 3099, 3107 (1985) ("This [Eleventh Amendment] bar remains in effect when State officials are sued for damages in their official capacity."). Further, a defendant sued in his official capacity for monetary damages is not considered a "person" subject to suit under § 1983. *See Will v. Mich. Dep't of State Police*, 109 S. Ct. 2304, 2312 (1989) (concluding that a state, its agencies, and its officials sued in their official capacities for monetary damages are not considered persons for the purpose of a § 1983 claim); *Thomas v. Noder-Love*, 621 F. App'x 825, 831 (6th Cir. 2015) ("It is also well-settled that [Eleventh Amendment] . . . immunity applies to claims under § 1983, meaning that states and state officials sued in their official capacity are not considered 'persons' under § 1983 and, therefore, cannot be sued for money damages without the state's consent."). "Section 1983 claims are not

cognizable against state officials sued in their official capacity." *Doe v. Patton*, 381 F. Supp. 2d 595, 598 (E.D. Ky. 2005) (emphasis removed). Based on these principles, Haun in his official capacity is plainly entitled to immunity from the federal claim. As a state official sued in his official capacity, he is not subject to this § 1983 claim. *Will*, 109 S. Ct. at 2312.

In sum, Eleventh Amendment immunity shields the Kentucky Department of Education, the Kentucky School for the Deaf, and Haun in his official capacity from the § 1983 claim.

*Immunity on the State Claims – KDE, KSD, Haun (Official Capacity)*

The Court generally applies "Kentucky governmental immunity law to [Plaintiff]'s state law claims." *Shepherd v. Floyd Cnty.*, 128 F. Supp. 3d 976, 980 (E.D. Ky. 2015); *see Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680-81, 685 (6th Cir. 2013) (applying federal immunity standard to federal claim and Michigan immunity standard to state law claim); *Chesher v. Neyer*, 477 F.3d 784, 796-97 (6th Cir. 2007) (applying Ohio immunity rules to Ohio-law claims); *Doe v. Magoffin Cnty. Fiscal Court*, 174 F. App'x 962, 971-72 (6th Cir. 2006) (applying Kentucky immunity law to Kentucky-law claims). There is no shortage of Kentucky decisions explicating the boundaries of state-law-based immunity. In fact, questions of immunity have "vexed the courts of the Commonwealth for decades." *Coppage Constr. Co., Inc. v. Sanitation Dist. No. 1*, 459 S.W.3d 855, 859 (Ky. 2015). In the context of this case, however, the boundaries are relatively straightforward.

In general, "a state agency is entitled to immunity from tort liability to the extent that it is performing a governmental, as opposed to a proprietary, function." *Yanero v.*

*Davis*, 65 S.W.3d 510, 519 (Ky. 2001); *Jones v. Cross*, 260 S.W.3d 343, 345 (Ky. 2008)
(same).[15] In the Commonwealth, operating public schools is a governmental function.
*E.g.*, *Clevinger v. Bd. of Educ. of Pike Cnty.*, 789 S.W.2d 5, 10-11 (Ky. 1990) ("[P]ublic
schools are a responsibility of the state[.]"; "[S]chool funds are the funds of the
Commonwealth[.]"); *Wallace v. Laurel Cnty. Bd. of Educ.*, 153 S.W.2d 915, 916 (Ky.
1941) ("[E]very common school in the state is a state institution controlled and regulated
by the state."); *id.* (A "city in maintaining its public school system is acting in a
governmental capacity."); *Commonwealth v. Burnett*, 35 S.W.2d 857, 858 (Ky. 1931)
("Public education has always been regarded as a matter of state concern[.]"); *City of
Louisville v. Bd. of Educ. of City of Louisville*, 157 S.W. 379, 380 (Ky. 1913)
(Maintenance of schools is an act of "state character."); *see also Hutsell v. Sayre*, 5 F.3d
996, 1002 (6th Cir. 1993) (granting UK and its officials immunity and stating, "higher
education has long been recognized as a governmental function").

Here, as to KSD in particular, the calculus is even stronger. The School carries a
sweeping mandate, apart from the education of its students. It "also serve[s] as the
Statewide Educational Resource Center on Deafness[.]" KRS 167.015(2). This
underscores KSD's palpable governmental function. The underlying legal principle is
clear: "Governmental immunity extends to state agencies that perform governmental
functions (i.e., act as an arm of the central state government) and are supported by money
from the state treasury." *Autry v. W. Ky. Univ.*, 219 S.W.3d 713, 717 (Ky. 2007) (finding
that "WKU is a state agency because it serves as a central arm of the state performing the

---

[15] "A proprietary function is of the type normally engaged in by businesses or
corporations and will likely include an element of conducting an activity for profit."
*Caneyville Volunteer Fire Dep't v. Green's Motorcycle Salvage, Inc.*, 286 S.W.3d 790,
804 (Ky. 2009) (finding that fire departments engage in governmental functions).

essential function of educating state citizens at the college level and because it receives money from the state treasury in support of this function" and holding that "WKU clearly is entitled to governmental immunity").[16]

Based on these principles, KDE, and as a state subdivision, KSD, are entitled to state-law immunity from the state-law claims. *See Williams v. Ky. Dep't of Educ.*, 113 S.W.3d 145, 154 (Ky. 2003) ("Appellants could have sued the DOE . . . except for the fact that [it is] shielded from liability by governmental immunity."); *see also Franks v. Ky. Sch. for the Deaf*, 956 F. Supp. 741, 749 (E.D. Ky. 1996) (dismissing, on immunity grounds, Kentucky-law negligence claims of failure to provide adequate security and supervision, as well as failure to exercise reasonable care for the safety of students), *aff'd* 142 F.3d 360 (6th Cir. 1998).

As to Haun in his official capacity, multiple levels of immunity bar the tort claims. First, "Eleventh Amendment immunity . . . bars any pendent state-law claims brought against state officials in their official capacity." *Thomas*, 621 F. App'x at 831. "With respect to the state law claims against the defendant officials in their official capacity, the Eleventh Amendment provides immunity from suit in federal court." *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 520 (6th Cir. 2007). This is so because "a federal suit against state officials on the basis of state law contravenes the Eleventh Amendment when—as here—the relief sought and ordered has an impact directly on the State itself." *Pennhurst State Sch. & Hosp. v. Halderman*, 104 S. Ct. 900, 917 (1984). "[A] claim that state officials violated state law in carrying out their official

---

[16] Plaintiff points to no immunity waiver and does not discuss or attempt to apply Kentucky's waiver framework. *See, e.g.*, *Withers v. Univ. of Ky.*, 939 S.W.2d 340, 346 (Ky. 1997) ("[P]ersons having negligence claims against the Commonwealth may be heard in the Board of Claims, but not elsewhere."); *see also* KRS 44.072.

responsibilities is a claim against the State that is protected by the Eleventh Amendment." *Id.* at 919. Additionally, Kentucky also extends immunity to Haun in his official capacity in these circumstances. *See, e.g.*, *Yanero*, 65 S.W.3d at 522 ("[W]hen an officer or employee of a governmental agency is sued in his/her representative capacity, the officer's or employee's actions are afforded the same immunity, if any, to which the agency, itself, would be entitled[.]"); *Autry*, 219 S.W.3d at 717 ("If a state agency is deemed to have governmental immunity, its officers or employees have official immunity when they are sued in their official or representative capacity."); *Jones*, 260 S.W.3d at 345 ("[O]fficial immunity is absolute when an official's or an employee's actions are subject to suit in his official capacity."). Based on these clear and controlling principles, Haun in his official capacity is thus entitled to immunity from the remaining state law claims.

In sum, the Kentucky Department of Education, the Kentucky School for the Deaf, and Haun in his official capacity all enjoy immunity regarding the state charges.

*Qualified Immunity on the Federal Claim—Haun (Individual Capacity)*

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 102 S. Ct. 2727, 2738 (1982)). Under the well-established two-step approach, the Court "consider[s] (1) whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right and (2) whether the right at issue was clearly established at the time of defendant's alleged misconduct, although not necessarily in this order." *Wenk v.*

*O'Reilly*, 783 F.3d 585, 593 (6th Cir. 2015) (internal quotation marks and alterations removed); *see also Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 493-94 (6th Cir. 2008) (same two-part test). The Court must avoid "a high level of generality" in assessing the clarity of the right or misconduct. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (*per curiam*) ("The dispositive question is whether the violative nature of particular conduct is clearly established. . . . This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." (internal quotation marks omitted) (citing *Brosseau v. Haugen*, 125 S. Ct. 596 (2004))). In the summary judgment context, the Court "view[s] all evidence, and draw[s] all reasonable inferences, in the light most favorable to the nonmoving party," here J.B.F. *Kent v. Oakland Cnty.*, 810 F.3d 384, 390 (6th Cir. 2016) (internal alteration removed). "Once a defendant invokes qualified immunity, the plaintiff bears the burden of showing that (1) the defendant's acts violated a constitutional right and (2) the right at issue was clearly established at the time of the defendant's alleged misconduct." *Barber v. Miller*, 809 F.3d 840, 844 (6th Cir. 2015). Qualified immunity is immunity from suit itself. *Pearson*, 129 S. Ct. at 815.

Here, the facts that Plaintiff alleges do not make out a constitutional violation by Haun. J.B.F.'s particular theory is exclusively grounded in the Fourteenth Amendment's Equal Protection Clause. *See* DE #1-1, at ¶ 38.[17] 42 U.S.C. § 1983 provides a federal

---

[17] Plaintiff's brief is perplexing on this point. The Complaint clearly and exclusively stakes the § 1983 claim in the Equal Protection Clause, DE #1-1, at ¶ 38, but Plaintiff never attempts to explain how such a constitutional violation occurred, instead writing about wholly unconnected matters. *McQueen v. Beecher*, the basis for much of Plaintiff's brief on this issue, *see* DE #25, at 7-9, is a deprivation-of-life *due process* case. 433 F.3d 460, 463 (6th Cir. 2006). The "state-created-danger doctrine" concerns the "under color of state law" requirement, not the underlying constitutional violation requirement. *Id.* at 463-64. As the Court explains, there was no Equal Protection violation here, so there is no need to address the "under color of state law" prong. The state-created danger

cause of action against governmental actors for the deprivation of federal constitutional rights under color of state law.

"The Equal Protection Clause is essentially a direction that all persons similarly situated should be treated alike." *Foster v. Michigan*, 573 F. App'x 377, 396 (6th Cir. 2014) (internal quotation marks removed). The Sixth Circuit has described the contours:

> The Equal Protection Clause of the Fourteenth Amendment commands that no state shall deny to any person within its jurisdiction the equal protection of the laws. To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment burdens a fundamental right, targets a suspect class, or has no rational basis.

*Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228, 256 (6th Cir. 2015) (*en banc*) (quoting *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011)) (alterations removed). "The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 457 (6th Cir. 2008). "In determining whether individuals are 'similarly situated,' a court should not demand exact correlation, but should instead seek relevant similarity." *Id.* (quoting *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 987 (6th Cir. 2012). Finally, "[d]isabled persons are not a suspect class for purposes of an equal protection challenge." *S.S.*, 532 F.3d at 457. Plaintiff does not assert a burden on a fundamental right.

---

construct is a creature of due process, not of equal protection. *See McQueen*, 433 F.3d at 464 (discussing "the state-created-danger theory of due process liability"). Plaintiff's constitutional claim rests only on equal protection values. DE #1-1 (Complaint), at ¶ 38 ("The above-described conduct by Defendants violated the right of the Plaintiff not to be deprived of equal protection of the laws under the Fourteenth Amendment to the United States Constitution.").

It is obvious, on this record, that no constitutional violation occurred. Plaintiff puts forward no proof that the government treated J.B.F. differently than other similarly situated persons or that any different treatment lacked a rational basis. Indeed, Stivers admitted that she was unaware of any differential treatment:

> Q:      Do you have any information that indicates the policies or procedures were applied differently to [J.B.F.] than they were applied to other students in the school?
>
> A:      I don't know of any other cases.

DE #18-2, at 60. There is simply no indication in this record that the Commonwealth— through KDE, KSD, or Haun—treated J.B.F. differently than similarly situated individuals. Because there is no constitutional right violation, there is no underlying basis for liability, and Haun in his individual capacity is entitled to qualified immunity on the federal claim. *Pearson*, 129 S. Ct. at 815.

Perhaps Plaintiff's equal protection theory is one relating to Haun's response to student-on-student harassment, which the Sixth Circuit recognizes in certain situations can violate the Equal Protection Clause. *See, e.g.*, *Shively v. Green Local Sch. Dist. Bd. of Educ.*, 579 F. App'x 348, 356-57 (6th Cir. 2014). To establish an equal protection violation under this theory, Plaintiff must "show either that [Haun] intentionally discriminated or acted with deliberate indifference." *Id.* at 357; *see also Stiles ex rel. D.S. v. Grainger Cnty., Tenn.*, ___ F.3d ___, ___, No. 15-5438, 2016 WL 1169099, at *12 (6th Cir. Mar. 25, 2016) ("The Sixth Circuit recognizes two methods of proving an equal protection violation based on a school official's response to peer harassment: (1) disparate treatment of one class of students who complain about bullying as compared to other classes of students, . . . and (2) deliberate indifference to discriminatory peer harassment[.]"). Deliberate indifference, in this context, "is a clearly unreasonable

response in light of the known circumstances." *Shively*, 579 F. App'x at 357 (internal quotation marks omitted). Proceeding under a deliberate indifference theory requires a plaintiff to prove "that he was subjected to discriminatory peer harassment." *D.S.*, 2016 WL 1169099, at *12.

J.B.F. does not explicitly raise such a theory or argument, but, regardless, it plainly fails. Plaintiff offers nothing to suggest either that Haun intentionally discriminated against J.B.F. in the response to the February 2014 incident or that Haun acted with deliberate indifference in his response to the incident. Haun's actions following the events were not "clearly unreasonable . . . in light of the known circumstances." As the Court explains elsewhere in this opinion, nothing shows prior notice to Haun of any threat, concerning information, or other intelligence signifying to Haun that J.B. would pose a threat to J.B.F. Haun (and other KSD actors) immediately responded to the situation, separated and interviewed the students, and instituted remedial actions. They apparently made several unsuccessful attempts to contact Stivers. While Stivers may have deeply-held concerns over Haun's (and the School's) response, nothing about it was "clearly unreasonable." Plaintiff alleges nothing about Haun's pre-assault conduct that amounts to deliberate indifference. Haun does not come into the picture until post-incident, and there is nothing to suggest Haun failed to take steps that effectively eliminated any further impropriety. J.B.F. does not show that Haun failed to enforce any school policy or departed from established practices in his treatment of J.B.F. Haun thus was not deliberately indifferent to J.B.F., and there was thus no Equal Protection Clause violation. *See D.S.*, 2016 WL 1169099, at *13 ("[Defendants] promptly investigated each incident of which they were aware, and each took measures within their power to punish

the students found culpable and to prevent further episodes of mistreatment. A reasonable jury could not find these actions exhibited deliberate indifference to [Plaintiff]'s claims of discriminatory harassment.").

*Qualified Immunity on the State Claims—Haun (Individual Capacity)*

In Kentucky,

> Qualified official immunity applies to public officers or employees if their actions are discretionary (i.e., involving personal deliberation, decisions and judgment) and are made in good faith and within the scope of their authority or employment. This is intended to protect governmental officers or employees from liability for good faith judgment calls in a legally uncertain environment. An act is not 'discretionary' merely because some judgment is used in deciding on the means or method used. However, even if an act is discretionary, there is no immunity if it violates constitutional, statutory, or other clearly established rights, or if it is done willfully or maliciously with intent to harm, or if it is committed with a corrupt motive or in bad faith. The burden is on the plaintiff to show that the public official or employee was not acting in good faith.
>
> If the negligent acts of public officers or employees are ministerial, there is no immunity. An act is ministerial if the duty is absolute, certain, and imperative, involving mere execution of a specific act based on fixed and designated facts. If ministerial acts are proper, then the public officer or employee has official immunity without qualification. Any act done by a public officer or employee who knows or should have known that his actions, even though official in nature, would violate constitutional rights or who maliciously intends to cause injury, has no immunity.

*Autry*, 219 S.W.3d at 717 (citations removed). *Yanero* set the boundaries:

> Qualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority. . . .
>
> Conversely, an officer or employee is afforded no immunity from tort liability for the negligent performance of a ministerial act, *i.e.*, one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts. . . .

> Once the officer or employee has shown prima facie that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith.

65 S.W.3d at 522-23 (citation omitted). Kentucky recently confirmed the contours:

> Qualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts (2) in good faith; and (3) within the scope of the employee's authority. However, an officer or employee is afforded no immunity from tort liability for the negligent performance of a ministerial act. Ministerial acts or duties are those that require only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts.

*Jones*, 260 S.W.3d at 345 n.1 (internal quotation marks, citations, and alterations removed).

Accordingly, public officials are generally not liable for "bad guesses in gray areas." *Caneyville Volunteer Fire Dep't*, 286 S.W.3d at 810. Thus, "in order to charge liability, a complainant may not merely allege injury, but must point to a causally related [v]iolation of a constitutional, statutory, or other clearly established right, or produce some proof that the action was not in good faith[.]" *Id.* (internal quotation marks and citations removed); *see also id.* ("[A] judgment call by a fire chief as to how, with what assistance, and in what manner to extinguish a fire is the very definition of a discretionary act.").

> The question of when a task is ministerial versus discretionary has long plagued litigants and the courts. Generally, a governmental employee can be held personally liable for negligently failing to perform or negligently performing a ministerial act. Part of the rationale for allowing this individual liability is that a governmental agent can rightfully be expected to adequately perform the governmental function required by the type of job he does. To the extent his job requires certain and specific acts, the governmental function is thwarted when he fails to do or negligently performs the required acts. But when performance of the job allows for the governmental employee to make a judgment call, or set a policy, the fact

that there is uncertainty as to what acts will best fulfill the governmental purpose has resulted in immunity being extended to those acts where the governmental employee must exercise discretion. To some extent, this says that governing cannot be a tort, but failing to properly carry out the government's commands when the acts are known and certain can be.

Stated another way, properly performing a ministerial act cannot be tortious, but negligently performing it, or negligently failing to perform it, can be. And the law provides no immunity for such acts, meaning the state employee can be sued in court. Negligently performing, or negligently failing to perform, a discretionary act cannot give rise to tort liability, because our law gives qualified immunity to those who must take the risk of acting in a discretionary manner. *Whether* the employee's act is discretionary, and not ministerial, is the qualifier that must be determined before qualified immunity is granted to the governmental employee.

*Marson v. Thomason*, 438 S.W.3d 292, 296 (Ky. 2014) (citations removed; emphasis in original). The analysis looks to the dominant nature of the act at issue. *Slattery v. J.F.*, ___ S.W.3d ___, No. 2013-CA-830-MR, 2015 WL 3424794, at *5 (Ky. Ct. App. May 29, 2015) ("Negligent supervision in the public school setting has been held to be both discretionary and ministerial based upon varying facts and circumstances.") (granting teachers qualified immunity and comparing cases); *Haney v. Monsky*, 311 S.W.3d 235, 240-41, 243-45 (Ky. 2010) (enforcing instruction to "keep the children in the middle of the path" was discretionary because it was a "general and continuing supervisory duty" that "depended upon constantly changing circumstances," "was largely subjective," and "left to the will or judgment of the performer" because it could be done in two or more lawful ways). Qualified immunity "is more than just a defense; it alleviates the employee's or officer's need even to defend the suit, which is to be dismissed." *Marson*, 438 S.W.3d at 298.

Here, Haun plainly performed discretionary acts. A KSD school safety officer obviously must deliberate and employ his judgment when making decisions. In a fluid

and evolving situation, such as investigating the J.B.F.—J.B. interaction here, the course of action will not be absolute, certain, and imperative, and the facts are not fixed— indeed, they develop before the officer's eyes. *See, e.g.*, DE #18-8, at 1 (narrating J.B.F.'s contemporaneous changes to the story). The facts and the situation are indeterminate, and Haun is required to react on the fly to changing circumstances. Haun does not merely obey orders of others. *Cf. James v. Wilson*, 95 S.W.3d 875, 909-10 (Ky. Ct. App. 2002) (categorizing teachers' conduct as discretionary because it "inherently required conscious evaluation of alternatives, personal reflection and significant judgment"). Haun, too, must (and did here) personally reflect, evaluate alternatives, and exercise significant judgment.

Here, Haun clearly did not perform a "ministerial task of enforcing a known rule," such as, in *Yanero*, instructing students to wear batting helmets or, in *Marson*, extending bleachers each morning. *Cf. id.* at 910; *see also id.* (stating that the teachers' "judgment may arguably be questionable, particularly with the benefit of hindsight, but applying such an unrealistic standard is not only unjust, it's unauthorized."); *Turner v. Nelson*, 342 S.W.3d 866, 876 (Ky. 2011) (finding teacher's supervisory actions discretionary and granting qualified immunity, stressing the importance of "appropriate leeway to . . . investigate complaints[,] . . . to form conclusions (based on facts not always known) as to what actually happened, and ultimately to determine an appropriate course of action"). Haun's role—like the principal in *Marson* and the teacher in *Turner*—is "so situation specific" and "requires judgment rather than a fixed, routine performance." *See* 438 S.W.3d at 299. Accordingly, "looking out for children's safety is a discretionary function . . . exercised most often by establishing *and implementing* safety policies and

procedures." *Id.* (emphasis added).[18] *Marson* and related cases all but dictate the result: Haun, as a school safety officer investigating incidents, forming conclusions based on facts not always known, determining appropriate courses of action, and implementing safety policies and procedures, performed discretionary functions. *See* DE ##20-1, at Answers to I9, 10, and 14 (describing the investigatory efforts and utilization of Haun's "professional judgment"); 25, at 4 (Plaintiff's brief stating that the Code "places the decision on how to classify the offense on the School Safety Officer").

As for the other qualified immunity elements, Plaintiff offers nothing to show that Haun acted in bad faith or that he violated any clearly established right. "Negligently performing, or negligently failing to perform, a discretionary act cannot give rise to tort liability[.]" *Marson*, 438 S.W.3d at 296. There is utterly no indication that Haun willfully or maliciously intended to harm Plaintiff. *Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 481

---

[18] Plaintiff mistakenly relies on the sweeping statement in *Williams* that "a school teacher can be held liable for injuries caused by negligent supervision of his/her students," 113 S.W.3d at 148, for the theory that Haun can be held liable here. The Kentucky Supreme Court "has repeatedly stated that a teacher's duty to supervise students is ministerial, as it requires enforcement of known rules." *Marson*, 438 S.W.3d at 301 (distinguishing the teacher merely performing bus duty from the principal). Merely supervising students and enforcing known rules in an "established and routine manner" is fundamentally different from Haun's duties as the school safety officer. *Id.* Haun's actions are more similar to law enforcement investigating and developing facts and, utilizing judgment, determining the best course of action. *Burnette v. Gee*, 137 F. App'x 806, 813 (6th Cir. 2005) (police investigating possible suicide situation were performing discretionary acts); *see also, e.g.*, *Lamb v. Holmes*, 162 S.W.3d 902, 909 (Ky. 2005) (teachers strip searching students performed discretionary acts). A manual does not rotely dictate Haun's every step. *Cf. Mattingly v. Mitchell*, 425 S.W.3d 85, 90 (Ky. Ct. App. 2013) (in context of police initiating a pursuit: "He either violated the procedures or he did not."). In contrast, Haun's role involves acts that "necessarily require the exercise of reason in the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued." *Burnette*, 137 F. App'x at 813 (quoting *Upchurch v. Clinton Cnty.*, 330 S.W.2d 428, 430 (Ky. Ct. App. 1959)); *see also Haugh v. City of Louisville*, 242 S.W.3d 683, 686 (Ky. Ct. App. 2007) (considering an investigating officer's need to make "an on-the-spot judgment call" and affirming the grant of qualified immunity).

(Ky. 2006). Further, there is no dispute that Haun acted within the scope of employment when he investigated and took the actions at issue in this case. Accordingly, because Haun's actions were discretionary, made in good faith, and within the scope of his employment, he is entitled to qualified immunity. *Autry*, 219 S.W.3d at 717. He can thus face no liability on the state charges, and the Court must dismiss them. *Marson*, 438 S.W.3d at 298.[19]

*Alternatively, the Merits—Haun (Individual Capacity)*

Although Haun individually is entitled to qualified immunity for the reasons set forth above, the Court alternatively analyzes the merits.[20]

<u>Negligence (Counts 2 and 5):</u> [21]

In Kentucky, to establish negligence, a plaintiff must prove "that (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached the standard by which his or her duty is measured, and (3) consequent injury." *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88 (Ky. 2003). "'Consequent injury' consists of what hornbooks separate into two distinct elements: actual injury or harm to the plaintiff and legal causation between

---

[19] As the subsequent merits discussion shows, it is exceedingly hard to decipher exactly what the criticism against Haun even is. The record shows no prior notice of any problem to Haun (and indeed, there was no prior problem between these students). The record shows no awareness by Haun of any pertinent history as to J.B. (and indeed, the only history in the record would not fairly apprize a decision maker of any unreasonable risk). Haun did an investigation and obviously took steps that prevented any further misconduct—Plaintiff alleges nothing untoward after the February 4 incident. The complaints about the timeliness of notice to Stivers do not directly implicate Haun, but in any event, Plaintiff can cite to no harm or injury related to any delay in Stivers's date of awareness.

[20] The Court elects against a plenary alternative review for all other claims and defendants, given the clarity of the immunity analysis. Regardless, the Haun individual federal qualified immunity analysis incorporates merits consideration.

[21] Plaintiff lists a "Sixth Claim for Relief," DE #1-1, at 12, but no fifth claim. The Court considers the sixth claim thus to be the fifth. This claim essentially repeats the Count 2 negligence allegations.

the defendant's breach and the plaintiff's injury." *Id.* at 88-89.[22] "Duty, the first element,

presents a question of law. Breach and injury, are questions of fact for the jury to decide.

The last element, legal causation, presents a mixed question of law and fact." *Id.* at 89

(citations omitted). "The standard of care applicable to a common-law negligence action

is that of ordinary care—that is, such care as a reasonably prudent person would exercise

under the circumstances." *Wright*, 381 S.W.3d at 213 (internal quotation marks

removed). The duty landscape is slightly altered in these particular circumstances because

the "special relationship . . . formed between a school district and its students imposes an

affirmative duty on the district, its faculty, and its administrators to take all reasonable

steps to prevent foreseeable harm to its students." *Williams*, 113 S.W.3d at 148 (internal

quotation marks omitted); *see S.S.*, 532 F.3d at 459.

Haun mainly protests foreseeability under the applicable *Williams* duty. DE #20,

at 6-7. Plaintiff's particular negligence theory is that Haun failed to protect J.B.F. from

harassment, abuse, assaults, and discrimination. DE #1-1, at ¶¶ 40, 53. Plaintiff, in the

negligence section of his brief, fails to mention *a single factual basis* for the claim as to

Haun. DE #25, at 15-16 (after four paragraphs of law, stating "Defendant Haun is just as

responsible for the negligent acts" but not identifying what those acts are). There is

simply no basis for a negligence finding here, as the record, in the light most favorable to

J.B.F., makes clear. Simply put, on this record, the J.B.F.—J.B. incident was not

foreseeable or chargeable to Haun.

---

[22] Thus, in a different formulation, "[a] common law negligence claim requires proof of (1) a duty owed by the defendant to the plaintiff, (2) breach of that duty, (3) injury to the plaintiff, and (4) legal causation between the defendant's breach and the plaintiff's injury." *Wright v. House of Imports, Inc.*, 381 S.W.3d 209, 213 (Ky. 2012).

27

J.B.F. explicitly said that he initially wanted to be roommates with J.B. J.B.F. had reported to an unnamed KSD official that two other students—not J.B.—had previously been mean. This report did not concern J.B. whatsoever. Stivers had no reason to believe there were altercations, harassment, or abuse between J.B.F. and J.B. prior to the February 2014 incident. She also had no knowledge of any such occurrences following the incident.

On the date in question, J.B.F. alerted Jamison and Yance—not Haun—that J.B. had accessed pornography on his phone. While accessing pornography may breach KSD rules, this report alone does not put any KSD official (certainly not Haun) on alert that J.B. would imminently sexually assault J.B.F. It does not suggest personally aggressive behavior. After the bathroom incident occurred, KSD officials, including Haun, investigated and interviewed the students and instituted remedial actions. They separated the students, and evidence indicates that they made several unsuccessful attempts to contact Stivers.

The posture as to Haun is particularly weak, as to any culpability, because he had little involvement in the actual incident—at most, he made notes and interviewed the students as part of an investigation afterward. *See* DE #20-1, at Answers to I9 and 10. Jamison and Yance were the primary KSD actors as the events unfolded. Regardless, there is simply no basis to find that Haun could or did foresee J.B. allegedly sexually assaulting J.B.F. There were no prior incidents between J.B.F. and J.B. to notify Haun of potential future trouble.[23] J.B.F. said that he wanted to be roommates with J.B. and that

---

[23] Plaintiff's theory, apparently, is that J.B.'s disciplinary history put Haun on notice that J.B. would likely "continue his pattern of violent sexual behavior" toward J.B.F. DE #25, at 8. There are multiple problems with this. First, Kentucky has rejected it: "Presumably,

he never told anyone at KSD that he was afraid of J.B. Officials spoke with J.B. after J.B.F. reported possession of pornography, and, regardless, viewing pornography does not portend an imminent sexual assault.[24] J.B.F. *only* reported pornography access; he did not, per his direct testimony, indicate any fear of assault or aggression. When the incident occurred, Haun and school officials reasonably reacted to it. Post-incident, there were no further negative J.B.F.—J.B. interactions.

Haun's basic duty was to take reasonable steps to prevent foreseeable harm to J.B.F. *Williams*, 113 S.W.3d at 148. This record indicates that Haun did just that. The incident was not foreseeable, and, thus, Haun owed no duty to J.B.F. to reasonably

---

the appellants sought to have the circuit court infer that [a student's] disciplinary problems established a pattern which placed the school appellees on notice that he had violent tendencies. Such an inference is not permissible as there is no allegation that any individual employee [here, Haun] was aware of [the student's] entire history and the school as an entity cannot be imputed with such knowledge." *James*, 95 S.W.3d at 908. Second, even if it were a viable theory, the only proof indicates that J.B. once, in 2009, "use[d] a wire hanger to put [in] his anus" and at some prior point engaged in preliminary sexual acts with a girl at home. DE #25-3 (Incident Report), at 1. The "person reporting incident" was Kevin Kreutzer, who is not involved in this case. The "leader's" signature is also not Haun. Noting J.B.'s apparent "very strong sexual desire," Mr. Kreutzer reported the incident to counseling and referred J.B. to address "his obsession." Mr. Kreutzer, on the same date, reported that J.B. once "played sex with a pillow on his bed." DE #25-3, at 2. Neither incident—from 5 years before the J.B.F. events and not demonstrably known to Haun—would suggest to Haun a need to protect students from potential J.B. sexual assaults or a J.B. proclivity toward aggressive behavior toward third parties. The submitted proof from prior incidents simply does not concern assaultive or aggressive behavior. Finally, the records are not authenticated. *See* Fed. R. Evid. 901(a). The Court would thus likely be justified in refusing to rely on them as a decision basis. *See Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (noting the Sixth Circuit's "repeated emphasis that unauthenticated documents do not meet the requirements of Rule 56(e)"). Plaintiff attached no proof whatsoever on the litany of alleged misconduct listed on DE #25, at 4-5. **The Court refuses to consider events wholly untethered to the record.**

[24] To the extent Plaintiff suggests that Haun violated certain provision(s) of the KSD Code of Conduct, the manual is not in evidence, so the Court cannot evaluate any such argument. Again, the negligence claim is anchored in a preliminary-to-the-incident failure-to-protect harbor.

prevent it.[25] No evidence suggests that J.B.'s sexual assault (assuming, at this procedural

stage, the interaction was non-consensual) was foreseeable. After it occurred, Haun and

school officials took reasonable steps to prevent such harm in the future. Thus, although

Haun is immune from the claim, alternatively, there is no basis to find that Haun was

negligent on these facts.

Negligent Training and Supervision (Count 3):

As a starting point, "an employer can be held liable when its failure to exercise

ordinary care in hiring or retaining an employee creates a foreseeable risk of harm to a

third person." *Oakley v. Flor-Shin, Inc.*, 964 S.W.2d 438, 442 (Ky. Ct. App. 1998). "[A]n

employer may be held liable for the negligent supervision of its employees only if he or

she knew or had reason to know of the risk that the employment created." *Carberry v.*

*Golden Hawk Transp. Co.*, 402 S.W.3d 556, 564 (Ky. Ct. App. 2013); *see also Booker v.*

*GTE.net LLC*, 350 F.3d 515, 517 (6th Cir. 2003) ("Kentucky law recognizes that an

employer can be held liable for the negligent supervision of its employees."). Kentucky

conflates the negligent training and negligent supervision standards. *Carberry*, 402

S.W.3d at 564 (setting forth same standard for "negligent training and supervision");

*Southard v. Belanger*, 966 F. Supp. 2d 727, 744-45 (W.D. Ky. 2013).

---

[25] As stated, the question here is really one of foreseeability as a duty element, which
courts regularly decide on summary judgment. *See, e.g.*, *James v. Meow Media, Inc.*, 300
F.3d 683, 691 (6th Cir. 2002) ("Under Kentucky law, it is clear that the existence of a
duty of care to the plaintiff, and its underlying foreseeability inquiry, is a pure question of
law for the court."). The Court recognizes that generally in Kentucky the question of
breach is for the jury. *See, e.g.*, *Lewis v. B & R Corp.*, 56 S.W.3d 432, 438 (Ky. Ct. App.
2001). However, even on breach, "where only one reasonable conclusion can be
reached," the Court may decide the issue. *Id.*; *Adkins v. Greyhound Corp.*, 357 S.W.2d
860, 862 (Ky. 1962) ("[W]hether a party conformed to the standard of care required of
him . . . [is an] issue[] of material fact unless the answer is so clear that there is no room
for difference of opinion among reasonable minds."); *see also, e.g.*, *Simons v. Strong*, 978
F. Supp. 2d 779, 785-86 (E.D. Ky. 2013).

The Court can make quick work of this thin claim. Haun persuasively argues against the tort's applicability to him, DE #20, at 8, and Plaintiff's brief offers no specific argument as to the negligent training / supervision allegation. DE #25, at 15-16. Haun says the he "was not charged with supervising or training the KSD staff responsible for the dormitory where the February 4, 2014 incident occurred. That is, Haun had no ministerial duty to train or supervise KSD dorm staff. Furthermore, Haun was not involved in the hiring process for those individuals." DE #20, at 8. Plaintiff does not contest these statements. There is also no suggestion that Haun is "an employer," as Kentucky law requires.[26] The pleadings and case contain no facts or details concerning any nexus between Haun and allegedly deficient training or supervision. Even if immunity did not shield Haun, he plainly faces no liability for negligent training or supervision.

IIED (Count 4):

The cause of action for the intentional infliction of emotion distress 'is intended to redress behavior that is truly outrageous, intolerable and which results in bringing one to his knees.' *Osborne v. Payne*, 31 S.W.3d 911, 914 (Ky. 2000). Four elements must be satisfied in order to state such a claim: '[1] the wrongdoer's conduct must be intentional or reckless; [2] the conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality; [3] there must be a causal connection between the wrongdoer's conduct and the emotional distress[;] and [4] the distress suffered must be severe.' *Id.* at 913-14.

---

[26] Further, there is no indication that Haun knew or had reason to know of any risk that others' employment created. *Cf. Martin v. Brame*, 111 F.3d 131, 1997 WL 163533, at *1 (6th Cir. Apr. 7, 1997) (affirming dismissal when there were "no facts presented that the two defendant teachers had any basis whatever to foresee the sexual attack that allegedly occurred" and "no knowledge of the assault as it occurred or any warning or notice that it might occur"). The fit is imperfect here because the negligent training and supervision claim so plainly is inapplicable to Haun.

*S.S.*, 532 F.3d at 459 (alteration removed). In Kentucky, this tort is a "gap-filler providing redress for extreme emotional distress in those instances in which the traditional common law actions did not." *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 299 (Ky. Ct. App. 1993) (internal quotation marks removed); *Papa John's Int'l, Inc. v. McCoy*, 244 S.W.3d 44, 49 (Ky. 2008) (describing the "outrageous conduct claim" as "a so-called gap-filler"); *Bennett v. Malcomb*, 320 S.W.3d 136, 137 (Ky. Ct. App. 2010). The torts of outrage and IIED are the same. *Green v. Floyd Cnty.*, 803 F. Supp. 2d 652, 655 n.1 (E.D. Ky. 2011). "The tort of outrage is still a permissible cause of action, despite the availability of more traditional torts, as long as the defendants solely intended to cause extreme emotional distress." *Id.* "It is for the court to decide whether the conduct complained of can reasonably be regarded to be so extreme and outrageous as to permit recovery." *Goebel v. Arnett*, 259 S.W.3d 489, 493 (Ky. Ct. App. 2007).

The IIED allegation fails for several reasons. First, Plaintiff offers no proof that Haun's conduct was "outrageous and intolerable" or that "it offends against the generally accepted standards of decency and morality." *Osborne*, 31 S.W.3d at 914. Plaintiff's specific argument appears to focus on the one-month delay in letter receipt and "Haun's failure to take remedial action." DE ##18-2, at 54; 25, at 15. School officials immediately responded to and investigated the incident. Officials separated the students, and no further impropriety occurred between J.B. and J.B.F. The evidence indicates that officials made numerous attempts to contact Stivers, which Plaintiff does not call into question. This, little of which involved Haun anyway, is a far cry from "outrageous and intolerable" conduct that offends generally accepted standards of decency and morality. The IIED tort requires "more than bad manners" and "hurt feelings." *Childers v. Geile*,

367 S.W.3d 576, 581 (Ky. 2012). It is "grounded in harassing and abusive behaviors[.]"
*Id.* It does not cover conduct that is "cold, callous, and lacking sensitivity." *Goebel*, 259
S.W.3d at 493. "Liability has been found only where the conduct has been so outrageous
in character, and so extreme in degree, as to go beyond all possible bounds of decency,
and to be regarded as atrocious, and utterly intolerable in a civilized community.
Generally, [a] case [resulting in liability] is one in which the recitation of the facts to an
average member of the community would arouse his resentment against the actor, and
lead him to exclaim, 'Outrageous!'" *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781,
789 (Ky. 2004), *overruled on other grounds by Toler v. Sud-Chemie, Inc.*, 458 S.W.3d
276 (Ky. 2015) (regarding substantive defamation requirements); *see also Stringer*, 151
S.W.3d at 789-90 (comparing factual scenarios where courts found and did not find
outrageousness).[27]

Plaintiff here presents nothing of the sort that qualifies under the Kentucky
standard. Immediately responding to and remedying a situation, attempting to contact the
guardian, guaranteeing no future incidents, and mailing a letter approximately 30 days
later, even if all involving Haun, simply is not "outrageous and intolerable" and does not
offend generally accepted standards of decency and morality. Neither letter receipt 30

---

[27] For example, courts found outrageous conduct when a priest used his position as a
marriage counselor for a husband to begin a sexual affair with his wife, when an
individual agreed to care for a plaintiff's long-time companion-animals and then
immediately sold them for slaughter, and when an individual subjected a plaintiff to daily
racial indignities for approximately seven years. *Stringer*, 151 S.W.3d at 789-90.
However, courts have *not* found the elements of IIED when an individual told a plaintiff,
who had just delivered a stillborn baby and was hysterical, to "shut up" and that the baby
would be "disposed of" at the hospital, shot and killed a beloved family dog, chained a
high school student to a tree by his ankle and neck, and erected a billboard referencing a
person's status as a child molester. *Id.* at 790-91. Even an improper burial does not
qualify as "outrageous and intolerable." *Keaton v. G.C. Williams Funeral Home, Inc.*,
436 S.W.3d 538, 545 (Ky. Ct. App. 2013).

days after an incident, nor any of Haun's actions, in these circumstances, would lead an average member of the community to exclaim, "Outrageous!," go beyond all possible bounds of decency, or invoke the truly outrageous or utterly intolerable in a civilized community.

Additionally, while "a plaintiff cannot maintain *both* a negligence claim and an intentional infliction of emotional distress claim based on a single set of facts," *Childers*, 367 S.W.3d at 581 (emphasis in original),[28] IIED could, in theory, stand alone, but Plaintiff here offers nothing to show that Haun "solely intended to cause extreme emotional distress." *Green*, 803 F. Supp. 2d at 655. Indeed, Plaintiff's theory of the original incident included allegations of physical harm by J.B. (the sexual assault and key punching) and Defendants' alleged negligent failure to protect J.B.F. from such violence. The theory thus independently fails on this ground. There is zero evidence of Haun having any bad or ill intent.

Finally, Plaintiff offers no expert proof on the degree or cause of any emotional harm, another likely fatal flaw to any IIED theory here. *See, e.g.*, *MacGlashan v. ABS Lincs KY, Inc.*, 84 F. Supp. 3d 595, 605 (W.D. Ky. 2015) (applying *Osborne v. Keeney*, 399 S.W.3d 1 (Ky. 2012) to IIED claim: "This Court joins the latter group in holding *Osborne*'s requirement for expert testimony is limited to NIED and intentional infliction

---

[28] "[W]hile the intentional infliction of emotional distress could be pleaded alternatively, a litigant cannot prevail on both a negligence claim and an intentional infliction of emotional distress claim on the same set of facts." *Childers*, 367 S.W.3d at 581; *see also id.* at 582-83 ("Thus the notion that intentional infliction of emotional distress is a gap-filler tort is correct. It is also correct that it is a stand-alone tort under the right facts. This is not to say that it cannot be pleaded alternatively, but there can be only one recovery on a given set of facts. . . . There can be only one recovery for emotional distress on the same acts. It will either be caused as a result of an injury done to the plaintiff physically or it will be caused by outrageous conduct the purpose of which is to inflict emotional distress.").

of emotional distress claims."); *see also, e.g.*, *White v. Bourbon Cmty. Hosp., LLC*, No. 5:14-CV-79-REW, 2016 WL 208303, at *9 (E.D. Ky. Jan. 15, 2016). The failure "to present sufficient affirmative evidence concerning any severe emotional distress" is "fatal to [an] IIED claim." *Keaton*, 436 S.W.3d at 545. For these reasons, even if Haun was not immune from suit, he did not actionably inflict emotional distress.

## IV.   CONCLUSION

"The most sensitive nerve in the human body is the parental nerve." *Eva N.*, 741 F. Supp. at 627 (Bertelsman, J., quoting Swinford, J.). This is surely no less true for a caring guardian such as Stivers. The Court is not unmindful of the potent human element present in this case, but however unfortunate the events leading to this suit may be, for the foregoing reasons, every claim against each Defendant fails as a matter of law. The Court thus fully **GRANTS** DE #20[29] and will enter a separate Judgment.

This the 3d day of June, 2016.



Signed By:

*Robert E. Wier*

**United States Magistrate Judge**

---

[29] The Court also **GRANTS**, as unopposed, DE #19. *See* DE #26 (Plaintiff response stating no objection). The Court did not consider as part of this ruling, and Plaintiff did not in any way rely on in argument, Dr. Barzman's notes summary. *See, e.g.*, *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998) ("On a summary judgment motion, the district court properly considers only evidence that would be admissible at trial."); *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) ("Evidence submitted in opposition to a motion for summary judgment must be admissible." (alteration removed)); *McGuire v. Mich. Dep't of Cmty. Health*, 526 F. App'x 494, 496-97 (6th Cir. 2013) (citing *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997) (when the nonmoving party bears the trial burden, its proffered evidence need not be in admissible *form*, but its *content* must nevertheless be admissible)).